UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**DANIEL AND NATALIE DIEDRICH**
                Plaintiffs,

                                                  Case No.: 17CV1104

v.

**OCWEN LOAN SERVICING, LLC**
P.O. Box 24737
West Palm Beach, FL 33416-4737
                Defendant.

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**NOW COMES,** the Plaintiffs, Daniel and Natalie Diedrich, by and through their Attorneys, Lawton & Cates, S.C. and Attorney Briane F. Pagel, and hereby move the Court for an order granting summary judgment to them finding that Ocwen has violated state and federal law, and setting the matter for a trial on damages and award of attorney's fees.

## BACKGROUND FACTS:

This is the latest dispute between the Diedrichs and their longtime loan servicer, Ocwen Loan Servicing.[1] After Ocwen filed for foreclosure against the Diedrichs in 2010[2] the Diedrichs moved to dismiss and then ultimately settled the case, with the state court foreclosure case being dismissed (originally) in July 2011. PFOF[3] 5-7.

The state court foreclosure case was settled by the parties entering into a loan modification. That loan modification agreement set the Diedrichs' initial monthly payments of

---

[1] A full review of the prior history between the parties is available in *Diedrich v. Ocwen Loan Servicing LLC*, 839 F.3d 583 (7th Cir. 2016).
[2] Case number 10 CV 332, Calumet County, Wisconsin, Circuit Court.
[3] "Plaintiffs' Proposed Findings of Fact" will be referred to as "PFOF".

1

principal and interest at $640.98. PFOF 30. The initial interest rate on this agreement was 2%, which was to remain in effect until July 1, 2016; on July 1, 2016 the interest rate would increase to 4.5% and remain at that rate for the life of the loan. The loan was to be paid in monthly installments through February 28, 2037, at which time a balloon payment would be due. PFOF 33-34. This balloon payment was necessary because payments of $640.98 would be insufficient to pay the entirety of the loan by the final payment. Id. The loan modification agreement said nothing about whether the P&I portion of the payment might change over the course of the loan; this is notable because the agreement did expressly say that other payments or charges might change: the agreement expressly noted that the interest rate would change (once) in July 2016, and that the balloon payment "may vary" if the interest rate changes. PFOF 36.

Because of that, the Diedrichs understood the agreement to be that the initial monthly P&I of $640.98 would never change. PFOF 36. They interpreted the agreement as saying that the interest rate change in 2016 would not affect their monthly P&I payment of $640.98, which would remain the same, but the additional interest that would accrue and be unpaid would result in the balloon payment growing larger. PFOF 37. It was on this express assumption that the Diedrichs agreed to the modification, reasoning that although the balloon payment would mean they would likely never sell their house or develop equity in the house, the low, fixed P&I payment would let them set aside money every month to use for emergencies or to leave to their children. PFOF 38.

In May 2016, the Diedrichs received a letter from Ocwen telling them that their interest rate would increase effective 6/1/2016. PFOF 9. Although the letter increased their payment to $1,292.57 on July 1, 2016, it said that the interest rate as "effective" June 1, 2016. PFOF 9.

2

Around that time, the Diedrichs also were told by Ocwen that Ocwen had made a distribution from their escrow account of $619.43 for a "Misc. Escrow Disbursement." They had no idea what this disbursement was for, but it caused a shortage in their escrow account requiring them to pay additional money to bring the account back to zero. PFOF 8.

The Diedrichs (who at the time were already litigating against Ocwen for other problems arising from the state court settlement) wrote a letter to Ocwen on June 1, 2016. PFOF 11-12. This letter outlined their concerns and requested information to address those concerns.

Ocwen acknowledged receipt of this letter on June 10, 2016. PFOF 13. On July 21, 2016, Ocwen sent the Dierichs a letter saying that their "request has taken additional time to complete" and promised a response in the future. PFOF 13.

Despite that promise, Ocwen never sent a substantive response to the QWR. PFOF 26. The Diedrichs have thus not received answers to the questions posed in that letter.

Further facts will be stated in the argument where necessary.

## ARGUMENT:

On motion of a party, the Court must grant judgment in favor of a party entitled to it if there are no material issues of fact. FRCP 56. Summary judgment is appropriate where the record as a whole demonstrates that a rational trier of fact could not find for the party against whom the motion is filed. Durkin v. Equifax Check Services, 406 F.3d 410, 414 (7th Cir. 2005).

3

## I. Ocwen has violated RESPA and Section 224.77(1)(k), Wis. Stats., by failing to respond to the qualified written request the Diedrichs made and by failing to correct the loan payment amount.

Under the Real Estate Settlement Procedures Act ("RESPA"), a mortgage loan servicer who receives a "qualified written request" must respond by providing information requested to the borrower, and by making appropriate corrections to the borrowers' account. 12 USC §2605(e)(2)(A) and (B). These actions must be done within 30 business days of receipt of the letter. 12 USC §2605(e)(2). If the servicer is unable to answer the questions or obtain the information, the servicer must (in that same time frame) "provide the borrower with a written explanation … that includes… an explanation of why the information requested is unavailable or cannot be obtained." 12 USC §2605(e)(2)(C)(i).

### A. Ocwen's July 21, 2016 letter does not comply with RESPA, and accordingly violates both 12 USC §2605 and §224.77(1)(k), Wis. Stats.

The June 1, 2016 letter written by the Diedrichs was clearly a "qualified written request" ("QWR"). A letter is a QWR if it tells the servicer why the borrower believes there is an error, and includes information sufficient to allow the servicer to identify the borrower and his or her account. 12 USC §2605(e)(1)(B).

Ocwen received the Diedrichs' QWR on June 10, 2016, and so was required to respond not later than July 26, 2016 by either correcting their account and providing information requested, or at the least by providing the Diedrichs with a written explanation why it could not provide the information requested.

4

Ocwen never corrected the account; the Diedrichs did not have their escrow account adjusted, and are still making the higher payments. Ocwen did not provide any substantive responses to the Diedrichs' questions, either, so Ocwen's *only* potential defense would be if the July 21 letter complied with subsection (e)(1)(B). It does not. The July 21 letter says that Ocwen has not yet answered any of the questions, and is "working diligently"[4] to get those answers. But the letter does not explain why Ocwen could not obtain the information the Diedrichs were seeking; and there is no conceivable reason why Ocwen would be unable to get the information requested: the QWR requested information that was patently within Ocwen's bailiwick, such as an accounting of what Ocwen was doing with their payments, how Ocwen had calculated their payments, what Ocwen had paid the $640.98 "Misc" escrow payment for, and how much Ocwen thought it was owed on the loan, among other requests.

Because Ocwen failed to comply with RESPA, it has violated 12 USC §2605 and Wis. Stats. §224.77(1)(k). That section prohibits a lender from violating any provision of any federal statute relating to practice as a mortgage banker; RESPA is just such a federal statute.

## B. Ocwen's raising interest rates a month early, and breaching the loan modification agreement are all violations of Wis. Stats. §224.77(1)(m), Wis. Stats.

Subsection 224.77(1)(m), Wis. Stats., makes it illegal for a mortgage banker[5] to engage in improper, fraudulent or dishonest activity; those terms include conduct both "of the same or a different character than specified elsewhere in" the section. A failure to comply with a contract,

---

[4] This is incorrect; as shown by Ocwen's records and corporate custodian's testimony, Ocwen was not actually working on the letter at all as of June 21, 2016. PFOF 18-19. The July 21 letter appears to be the final letter on the subject; it says at the end that Ocwen "trust[s] that the information provided has fully addressed" the Diedrichs' questions.
[5] A mortgage banker is any business entity which services residential mortgage loans or provides escrow services. §224.71(3), Wis. Stats. There is no dispute that Ocwen fits that definition.

5

or receiving money one is not entitled to receive, or breaching a promise on which a party to an agreement has relied, can all state a claim under §224.77(1)(m). See SJ Props. Suites v. Specialty Fin. Grp. LLC, 864 F. Supp.2d 776 (ED WI 2012) (Concluding that facts plead to state a claim for promissory estoppel or unjust enrichment support a claim for violation of (1)(m) as well.)

There can be no doubt that the first error the Diedrichs assign to Ocwen violates §224.77(1)(m) regardless of how the contract is interpreted. The loan modification agreement the parties signed to resolve the foreclosure case does not allow the interest to be increased before July 1, 2016, but Ocwen raised the interest (or threatened to do so, at the least) a month early.

The more complicated issue is Ocwen's breach of the loan modification agreement's requirement that P&I payments remain the same regardless of the one-time interest rate increase.

1. **The contract does not allow the P&I payment to increase, regardless of changes in the interest rate.**

Nothing in the loan modification agreement says that the principal and interest amounts of each monthly payment might change, and because of that, the contract simply does not allow for the P&I payment to increase.

The loan modification agreement cover letter sets out the new P&I payment as a regular monthly amount. The agreement over the next few pages says that other aspects of the deal might vary over time, but never says that about the P&I monthly amount.

The agreement says that "[a]ny payments due for taxes or insurance will be your responsibility in addition to the payments of principal and interest required under the terms of this modification." This indicates that the *total payment* -- P&I plus other items – might be different from the P&I payment, but does not say that P&I might change.

The agreement says that the interest rate will change, once, on July 1, 2016. It does not say that at that time the P&I payment might or will increase.

And, the agreement says that the balloon payment "may vary depending on… interest rate changes that occur during the life of the loan." But again, the disclosure does not say that the P&I payment will likewise vary.

Because nothing in the agreement allows the P&I payment to be changed, Ocwen lacked the right to change the P&I amount, and its decision to do so in July 2016 and thereafter violates §224.77(1)(m), Wis. Stats.[6]

---

[6] In <u>Security Sav. And Loan Ass'n. v. Wauwatosa Colony, Inc.</u>, 71 Wis.2d 174, 237 N.W.2d 729 (Wis. 1975), the Wisconsin Supreme Court ruled that a clause which said the lender could increase the interest rate on a note, but did not limit the number of increases, allowed the lender to increase the interest rate multiple times. The majority did not deal with the type of question presented here, but the concurring opinion did. Noting that the bank had both increased the interest rate *and* the monthly payment, the concurring opinion said:

> However, under both the statute and the clause in the mortgage, the sole and limited right given to the savings and loan association to alter the agreement of the parties was to increase the interest rate. No other provisions in the mortgage agreement could be altered. In the case before us, in its first upward adjustment of interest rate and monthly payments for principal and interest, as set forth in its notice of June 28, 1968, the savings and loan association went beyond its limited authority under the statute and under the provisions of the mortgage agreement. That notice provided, in material part:
>
> 'As of November 1, 1968, the interest rate on your loan will be increased 2% per annum. Your payments for principal and interest will be adjusted to $917.00 per month thereby increasing your total monthly payment to $1243.50.
>
> 'We trust that you will understand the need for these changes.'
>
> Two changes were thus made in the mortgage agreement. The first was the increase of two percent per annum in the interest rate. The second was the increase in monthly payments.
> ….
>
> When the savings and loan association here, in its 1968 notice, increased the amount of the monthly payments as well as increasing the interest rate, it did two things, not one. As to the interest escalation, it was exercising its option under the agreement and pursuant to the statute. As to the increase in the monthly payments due under the contract, it was proposing a new mortgage contract. Under the original agreement, the escalated interest payments would have come out of the stipulated monthly payments, leaving a smaller balance to be applied on the principal. … **Such option to increase such monthly payments was not reserved to the association under this mortgage contract**.

7

2. **<u>Alternatively, the contract is ambiguous about whether the P&I can increase if the interest rate changes, and must be construed against Ocwen as the drafter.</u>**

The goal of contract interpretation is to give effect to the parties' intentions. <u>Seitzinger v. Community Health Network</u>, 2005 WI 28 par. 22, 270 Wis.2d 1, 6767 N.W.2d 426 (Wis. 2004). The court does this by looking at the language of the contract, but where that language is ambiguous, the Court may look to extrinsic evidence to determine intent, and must construe ambiguities against the drafter. <u>Id.</u>

Here, the second rule cuts against Ocwen, which drafted this agreement, so any ambiguity as to what happens to the P&I payment when the interest rate changes must be interpreted against Ocwen as the drafter of the contract. Ocwen could have said "Your principal and interest payment will increase on July 1, 2016 when the interest rate increases." It did not say that, and so cannot be allowed to effectively amend the contract to read the way Ocwen *wanted* it to read.

But there is extrinsic evidence to support the Diedrichs' interpretation – namely, how they read the contract and why they would enter into a contract that would mean the balloon payment on their loan would effectively bar them from ever refinancing or selling the house they lived in, and they would never develop equity in the house, either.[7] The Diedrichs believed, at the time of

---

<u>Security Sav. and Loan Ass'n v. Wauwatosa Colony, Inc</u>., 71 Wis.2d 187-189 (Wis. 1975). The concurrence's reasoning applies here, as well: Ocwen clearly reserved the right to increase the interest rate, once, but never reserved the right to increase the monthly payment based on that interest rate increase.)

[7] A loan of $207,456.98 at 2% interest over 26 years (307 months, in this case) results in a P&I payment of $863.87 monthly. The Diedrichs underpaid their loan by at least $222.89 for the first five years of the loan. While the Diedrichs (still) do not know what their new principal balance was on July 1, 2016 (or how Ocwen was applying the $640.98), it is clear that however Ocwen applied it, the *minimum* balloon payment would be $68,427.23 ($222.89 x 307 months.) An amortization table using the parameters of the loan modification at the outset (2% interest, principal of $207,456.98, 307 months) shows that after five years, if payments of $863.87 were made for those five years, the resulting principal balance would be $168,441.09, meaning that $39,015.89 was paid to principal over the first five years. $39,015.89/640.98 = 60.86, so it is conceivable (although unlikely) that Ocwen had applied *all* the Diedrichs' payments over the first five years solely to principal.

8

entering into the loan modification agreement, that the terms meant they would effectively be renting their house for 26 years, not developing equity or having the ability to sell it. They entered into the agreement anyway, believing that what they were saving each month would make up for their inability to build up equity.

Ocwen, meanwhile, can have its intentions discerned from its actions. Ocwen at the outset set up an agreement under which the majority of its payment would not come until 26 years later, with the balloon payment; by drafting the agreement in such a manner, Ocwen's intent becomes clear: it was allowing the Diedrichs to make a payment well below the amount that would otherwise be required to pay the loan in full over 26 years without a balloon payment, and was willing to wait 26 years for the bulk of its payment.

Increasing the monthly P&I in July 2016 is inconsistent with that original intent. Either the new, $906.91 P&I payment is enough to avoid the balloon payment increasing from what it would be as of July 1, 2016 in which case Ocwen's language indicating the balloon payment

---

If Ocwen did so, then the new principal balance of $168,441.09 would be amortized over the remaining 248 months at 4.5%. This would result in a $1,044.47 monthly P&I payment. The new P&I payment Ocwen required was $906.91, so if Ocwen had applied all 60 of the Diedrichs' first payments to principal, and then increased the interest but *not* increased the P&I to the full new amount, the Diedrichs would be paying $137.56 less per month than the total P&I for the final 248 months of the loan. If that is what happened, then the final balloon payment would be, at a minimum, (60x222.89) + (248x137.56), or $47,488.28. That is, the balloon payment is estimated to be at least $47,488.28 even if Ocwen applied the payments in the manner most beneficial to the Diedrichs.

However, the fact that the new payment was only $906.91 (P&I) suggests one of two things:

First, there was less principal owed as of July 2016 than $168,441.09 – which would be impossible because the total of *all* P&I payments the Diedrichs made in the first 5 years was not sufficient to reduce the balance below that, or

Second, that when the interest rate increased, Ocwen increased the P&I, but did not increase it to an amount that would cover the entire increase in the payment. If this was what Ocwen did, then an increase of interest leading to a *partial* increase in the P&I payment is also not justified or allowed under the loan modification agreement, and doing so would result in the balloon payment being even larger than the minimum $47,488.28.

What all this shows, overall, is why the Diedrichs needed the QWR answered, since absent looking at the strict terms of the contract, it is impossible for them to derive on their own how much their payment *should* be or how much the ultimate balloon payment might be, so they have no way of knowing whether they have equity in their house or how much equity they might have, and accordingly no way to even seek to refinance the loan at a lower interest rate.

9

may increase if interest rates is unnecessary and inaccurate; or, the new $906.91 payment was still insufficient to pay the entire principal and interest each month, but is still more than the $640.98 monthly payment set at the outset, in which case Ocwen is still evincing an intent to allow the Diedrichs to pay the bulk of their mortgage in February 2037, but it for some reason arbitrarily set the new payment amount without regard to any contract language or discernible mathematical formula. Whichever one of those it was, Ocwen lacked the power to take that action under the contract.

Whether the contract is ambiguous or not, it prohibited Ocwen from increasing the monthly P&I when the interest rate adjusted to 4.5% in July 2016, and so Ocwen's doing so (and continuing to require the higher payment) is in violation of §224.77(1)(m), Wis. Stats.

### C. The Diedrichs have suffered damages and are entitled to a trial on those damages.[8]

As both the Diedrichs and Ocwen know, the issue in the type of dispute before the Court boils down to what damages were caused by the violation. Violations of RESPA and §224.77 require actual damages caused by the violation. Diedrich v. Ocwen Loan Servicing 839 F.3d 583 (7th Cir. 2016) ("*Diedrich I*").

#### 1. The Diedrichs have suffered damages that are sufficiently linked to the failure to respond to the QWR.

In the last *Diedrich/Ocwen* case, the 7th Circuit held that the Diedrichs' claims of damages were essentially from the foreclosure proceedings and loan modification process, rather than any failure to answer the QWR. See Diedrich, 839 F.3d at 593. The Court did not there decide how

---

[8] The Diedrichs, by moving for summary judgment on only one subsection of §224.77(1)

10

Case 2:17-cv-01104-WED   Filed 12/16/19   Page 10 of 14   Document 38

much or what type of evidence was necessary to link damages to a failure to respond to a QWR, but noted that the damages must be caused "specifically by Ocwen's inadequate response." Id.

The dispute in *Diedrich I* arose because the Diedrichs then had questions about the administration of their escrow account and being potentially charged litigation fees. Id. at 839 F.3d 586. When they were deposed, the Diedrichs testified to credit harm, and "the stress of dealing with this every single month," and said those damages – especially the emotional distress" came from "everything that Ocwen has put [them] through over the three years of this lawsuit." The 7th Circuit believed this testimony to point towards the foreclosure case and related problems, not the lack of an answer to the QWR.

By contrast, the damages here flow directly from the failure to respond. Both Dan and Natalie have supplied affidavits saying that without an explanation as to how Ocwen determined the new payment and why they raised the payment, they cannot determine if they are making the correct payment and have to worry about future resets of payments. They also have to worry that their money is not being applied correctly to the loan, and cannot be sure where the extra $265 or so each month is being applied. This has made them worry that Ocwen might not be applying the money to the principal and interest, and that because of that they might be declared in default again and forced to defend a foreclosure. See Natalie Aff. Pars. 17-24; Dan Aff. Pars. 17-24.

Ocwen was asked to, but never did, provide Dan and Natalie with an accounting of their loan showing how money had been applied since 2011, and the formula used to determine both the original $640.98 payment and the new $906.91 payment. That information would have helped the Diedrichs stop worrying about how their payments were applied and how the new number had been arrived at. See Johnson v. HSBC Bank, 11 CV 2091 (SD Cal, 3/19/2012) 2012 WL 928433 at p. 6. (Finding that complaint which alleged the servicer failed to provide information

11

and the failure caused him to pay more than was necessary stated a claim for actual damages under RESPA.)

Ocwen was asked to provide information about what it believed the loan modification agreement meant about future increases of P&I at the time it was entered into, but again failed to answer that, so Dan and Natalie cannot be certain they are interpreting the agreement correctly.

Ocwen was asked to provide an amount owed as of a date certain, broken into categories and stating whether interest was accruing on each category, as well as the amount of the balloon payment Ocwen calculated and how it did so. Again, this would have helped Dan and Natalie understand how their payment was being applied, and might also have demonstrated that their interpretation as to whether they would ever have equity in their house was correct or incorrect, allowing them to better understand the loan modification. But because Ocwen did not respond, they cannot have that certainty.

And, overall, because of the lack of answers, Dan and Natalie have been paying the extra $265 per month to avoid being declared in default. Natalie Aff. Par. 18. This means that they are losing $265 per month because they cannot be sure they would avoid foreclosure if they refused to pay the higher amount, and thus have to worry that they will not have the savings they wanted in lieu of building equity in their house.

The worries Dan and Natalie provided in their affidavits all would have been laid to rest by Ocwen simply providing an accounting of the loan it is servicing, and explaining how it calculated their current and prior payments. Had Ocwen done that, then Dan and Natalie would not have to be distressed over possible misapplication of their payments, future miscalculations of their payments, use of their P&I payments to pay escrow disbursements that should not have

12

been made, or any of the other things they worry about; and, if the investigation revealed that Ocwen was miscalculating the $906.91 payment, Ocwen was required to correct that under 12 USC 2605, so the Diedrichs would have avoided the extra $265 per month they have been paying since July 1, 2016.[9]

Those are sufficient damages to survive summary judgment; rather than the generalized concerns arising from 3 years of litigation, the Diedrichs had a narrow, specific concern that arose because Ocwen is breaching their loan contract. The Diedrichs are not asking the Court to rule on the amount of their damages at this point, because they want a jury to hear their testimony and consider the amount of emotional distress to award, but the evidence in the record is sufficient to allow the Court to rule in their favor as to liability, and find that they have damages caused by the violation of RESPA and §224.77.

## **CONCLUSION:**

Both RESPA and §224.77 are aimed at protecting consumers from mortgage lenders. At the heart of the RESPA qualified written request procedure is a simple mandate: when a borrower believes a problem exists on their loan, the servicer must either fix the problem in 30 business days, or provide information showing why it is not a problem (or both.)

The Diedrichs believed, and still believe, that Ocwen in early 2016 was breaching their loan modification agreement. They believed that because of that breach, their payments might not be getting applied correctly to their loan, and that the payments intended for principal and interest might be getting used to pay back mysterious and potentially unallowable escrow disbursements. They believed that if these things were true, then they might be suffering credit damage and

---

[9] In the event the Court agrees that the modification agreement does not allow an increase in P&I, then the failure to correct the loan is a violation of RESPA, and of §224.77(1), and the $265/month alone would be actual damages.

13

might be at risk of foreclosure, and this caused (and still causes) them significant amounts of distress.

Ocwen could have dispelled those beliefs by answering the Diedrichs' questions, but it never did so, even though the questions were not ones that required a great deal of research.

More seriously still, Ocwen and the Diedrichs entered into a loan modification agreement in 2011 that limited the Diedrichs' monthly P&I payments to a maximum of $640.98, and would apply any increases in interest to the final balloon payment. Rather than risk a new foreclosure action, the Diedrichs have been paying $265 more per month than the modification agreement calls for. They have paid $7,950 in excess payments so far, and Ocwen has continued to accept those payments and apply them in some manner they are not willing to disclose to the Diedrichs.

Ocwen's actions in this matter are the very definition of "improper," and for all the foregoing reasons, this Court should grant summary judgment to the Diedrichs on their first and second causes of action (as to liability) and set this matter for a hearing on damages.

Dated: This 16th day of December, 2019.

**Lawton & Cates, S.C.**
Attorneys for Plaintiffs
*Electronically Signed By:*

*/s/ Briane F. Pagel*
Attorney Briane F. Pagel
State Bar No. 1025514

P.O. Address:
345 W. Washington Ave. Ste. 201
P.O. Box 2965
Madison, WI 537013
P: 608.282.6200
F: 608.282.6252
bpagel@lawtoncates.com