# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DANIEL AND NATALIE DIEDRICH**
    Plaintiffs,

Case No.: 17CV1104

v.

**OCWEN LOAN SERVICING, LLC**
    Defendant.

## AFFIDAVIT OF DANIEL DIEDRICH

**STATE OF WISCONSIN**   )
          )SS
**COUNTY OF Calumet**    )

The undersigned, <u>Daniel Diedrich</u>, first being sworn on under oath, states the following:

1. I am an adult and make this affidavit on my own personal knowledge. I live at W2777 Crosstown Road, Hilbert, WI 54129-0000.

2. My mortgage loan has been serviced by Ocwen for some time. After Ocwen attempted to foreclose on us in 2010, we retained a lawyer and eventually worked out a loan modification as a settlement to that foreclosure case.

3. A true and correct copy of that loan modification accompanies this affidavit as **Exhibit A.**

4. Neither I, nor my wife Natalie, nor our lawyer, drafted the loan modification.

5. We received the loan modification's four pages, and reviewed that document. The first page of the loan modification included a letter which set out that our new monthly payment was going to be $952.71. This letter broke that payment down into principal and interest of $640.98, and an escrow payment of $311.73.

1

6. The second page of the loan modification agreement said that once we paid the initial payment of $952.71 (by May 30, 2011) and a second payment of $640.98 on July 1, 2011, our note would be "automatically" modified.

7. Upon modification, the "new principal balance" was to be $207,456.98. This is reflected at paragraph 2 on page 2 of the Loan Modification Agreement.

8. Paragraph 5, on page 3, said that we would make payments of principal and interest through 2037, but that there would be a "final balloon payment in an amount equal to all remaining amounts under the Note and Modification" due at that last payment. We understood this to mean that the monthly payments on the note would not be sufficient to cover all accruing interest as well as pay down principal, so that our payments would not be reducing the balance of the loan much, if at all. We were not provided an amortization table with this loan modification agreement, so nothing in it told us that our principal and interest payments would ever be more than $640.98. We understood paragraph 5, when read in conjunction with the remainder of the agreement, to mean that our principal and interest payments would always be $640.98, even after the interest rate increased from 2% to 4.5% in 2016.

9. We understood that after the interest rate increased in 2016, our payments would be $640.98 for principal and interest, and that any *additional* amounts of interest that would accrue beginning July 1, 2016, would simply be added to the balloon payment at the end of the loan.

10. Ocwen never was, and never has been, able to tell us how much the balloon payment at the end would be. We inquired of Ocwen at the time we entered into this loan modification, and they were unable to tell us the amount of the balloon payment. We took that to mean that the size of the balloon payment would change after the interest rate changed. This contributed to how we interpreted the loan modification agreement.

11. The final page of the 4-page loan modification agreement was a "Balloon Disclosure." That disclosure specifically said, "The balloon payment may vary depending on… any interest rate changes that occur during the life of the loan." This, too, contributed to our understanding that the monthly principal and interest payment would not change, because the Balloon Disclosure expressly said that the amount of the balloon payment might change if the interest rate changed; we understood that this would *only* happen if the interest rate changed but our payment did not change, since if our payment changed with the interest rate change, the amount of the balloon payment would never vary. It did not make sense to us to assume that the balloon payment would change even if our monthly payment increased to cover the additional interest, so we understood the loan modification agreement to be saying that while our interest rate might increase, our regular monthly payment of principal and interest would remain the same, with the increase amount owed as a result of the increase in interest being added to the balloon payment.

12. Our understanding of the loan modification agreement – that our payments would be $640.98 for principal and interest for the life of the loan, until the final balloon payment – was the sole basis for our agreeing to this loan modification. We understood that because there would be a sizeable balloon payment, we were essentially renting our house and would likely never be able to sell it or refinance the loan, since the loan balance would always be greater than the value of the house. We were willing to enter into that agreement precisely because our principal and interest payment would be low enough, at $640.98, that we could set aside some money in a separate savings account. That way, rather than building equity in our house (which would be impossible given the balloon payment) we would be able to set aside money to use for emergencies or someday leave to our children.

13. In 2016, we received a letter that said our interest rate would be increasing on June 1, 2016, rather than on July 1, 2016; and that our monthly payment would be increasing by $265 per month. This contradicted our understanding of the loan modification agreement.

14. We drafted a letter to Ocwen requesting information about these issues, and mailed it on June 1, 2016. A true and correct copy of that accompanies this affidavit as **Exhibit B.**

15. Ocwen has never provided a substantive response to our June 1, 2016 letter. Although we received letters saying they would eventually respond, they never did.

16. This is the second time Ocwen has failed to appropriately respond to a qualified written request on our loan alone. We had written one earlier that Ocwen also failed to respond to in any substantive way.

17. Because Ocwen has reset our interest rate a month early, and because Ocwen increased our payment despite the loan modification agreement saying that the balloon payment would be the one that increased if the interest rate changed, and because Ocwen never answered our questions about why these things happened, we have been unable to determine why Ocwen reset the loan as it did. We are thus unable to determine whether our payments are actually correct and are fearful that Ocwen will continue to reset the payments.

18. Ocwen's failure to respond to the June 1, 2016 letter has in particular increased my stress. After resolving the foreclosure case, I believed that we would be making a principal and interest payment of $640.98 for the remainder of the loan, until the balloon payment. I had intended to set aside some money each month to serve as a substitute for equity in the house, which money I would use to do repairs around the house and help our children financially if they needed it. But when Ocwen raised the monthly payment, we had to increase our payments or risk foreclosure again, and we did not want to incur additional attorney's fees or stresses of foreclosure, so we began paying the higher amount.

19. However, because I cannot tell *why* we are being forced to pay the higher amount, I have to constantly worry that Ocwen will misapply our money, or that they will change the amount of our payment again. If Ocwen is receiving the higher amount

4

but should not be, then I do not know where our extra payments are going or how they are being applied, and cannot be sure that they are being applied correctly. This leads to constant fear that this problem with the amount of the payment will affect our credit score (because Ocwen might believe we are not paying the correct amount and report that), or that Ocwen might be applying the money to things they should not be (such as legal fees incurred in the lawsuit we brought against them, which they should not be forcing us to repay.) This makes me worry that even though we are paying the higher amount, we will ultimately be claimed to be in default because I do not know how they are applying the money and if they are not applying it to our principal and interest, they might declare us in default. We asked which credit reporting agencies Ocwen reports to so we could monitor those agencies, but Ocwen refused to answer, and so we have to worry that there are negative credit reports being made about us. Negative credit reports can result in loss of employment opportunities, loss of loans for things like new cars, and higher insurance premiums, and we have to constantly worry that we will suffer these consequences, and as a result, we have not sought to borrow money since 2016 and we have not shopped around for different insurance carriers, even though there have been things we wanted to borrow money for (including home improvements) and even though we would like cheaper insurance premiums.

20. These worries are made worse by the fact that some statements we receive have unusual or unclear information. For example, in March 2016, we received a statement that said Ocwen had disbursed $619.43 for a "Misc Escrow Disbursement," and that this had resulted in a shortage in our account that we needed to make up. This was additional money we had to pay, to avoid a default on our loan, but we did not know what that payment was for. We therefore have to worry that Ocwen will apply money that should go to principal or interest to some mysterious "Misc Escrow Disbursement," and that we will be in default.

21. We had asked in our QWR specifically for an accounting of the loan and escrow account, as well as a total amount owed as of June 1, 2016 or other date certain,

5

broken into categories, to help resolve these worries, so that we could know our payments were being applied properly. Ocwen never sent us that.

22. We asked in our QWR for a description of what the April 2015 "MISC" escrow disbursement was, so that we would know whether we should challenge that and so that we would know whether this was the type of charge that might recur; if we knew what the charge was for and whether it might recur, we would be able to stop worrying about having mysterious charges put on our account without notice, potentially putting us in default on our loan and throwing us back into foreclosure.

23. We asked in our QWR how the loan was entered into Ocwen's computer system so that we could verify that no new interest rate increases would occur, which would let us avoid worrying about any future increases done in contravention of the loan modification agreement, and so that we could determine how much of our payment was going towards principal and interest so that we might be able to figure out how big our balloon payment was in the future, and so that we could verify whether we should only be paying the $640.98 in principal and interest, but Ocwen never answered us, so we still have to worry that the loan is incorrectly entered, and that there will be further confusion about payments in the future.

24. We also asked that Ocwen tell us how much it believed the balloon payment would be, so we could compare that and try to determine how the loan was being calculated. Again, without any answer from Ocwen, we cannot be assured that Ocwen is properly administering our loan and have to worry about the various potential negative consequences.

Daniel Diedrich

Subscribed & sworn to before me
This 13 day of December, 2019.

Notary Public, State of Wisconsin
My Commission Expires: 4/12/2020

ARWEN CAVANAUGH
NOTARY PUBLIC
STATE OF WISCONSIN

6