# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DANIEL DIEDRICH and
NATALIE DIEDRICH,

**Plaintiffs,**

v.                                       **Case No. 17-CV-1104**

OCWEN LOAN SERVICING, LLC,

**Defendant.**

## DECISION AND ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

## 1. Background

### 1.1. Relevant Facts

Plaintiffs Daniel and Natalie Diedrich on February 20, 2007, entered into an adjustable rate loan agreement with Decision One Mortgage Company, LLC. (ECF No. 56, ¶ 1.)[1] The loan was secured by a mortgage on their home. Defendant Ocwen Loan Servicing, LLC serviced the Diedrichs' loan. (ECF No. 53, ¶ 3.) The Diedrich's defaulted

---

[1] The court relies on the parties' proposed findings of fact for the facts presented here. Nearly all of the facts set forth in the Diedrichs' initial brief in support of their motion for summary judgment (ECF No. 38) are unsupported by the cited proposed finding of fact.

on the loan in April 2010 (ECF No. 56, ¶ 3), and in September 2010 Ocwen commenced foreclosure proceedings. (ECF No. 53, ¶ 4.)

On May 20, 2011, Ocwen and the Diedrichs entered into a Loan Modification Agreement[2] modifying the terms of the Diedrichs' Mortgage and Note secured by the Mortgage. (ECF Nos. 56, ¶¶ 4, 8; 42-1; 43-1; 44-4 at 2-4. The Loan Modification Agreement included a "Trial Period" that required two payments. (ECF No. 56, ¶ 5.) At the end of the "Trial Period" the loan would be deemed current and not in default. (ECF No. 44-4 at 2, ¶ 4.) A cover letter that appears to have been provided to the Diedrichs along with the Loan Modification Agreement provides that, beginning July 1, 2011, there will be a "New Monthly Payment" consisting of principal and interest in the amount of $643.98 and escrow in the amount of $311.73, for a total payment of $952.71. (ECF Nos. 42-1 at 1; 43-1 at 1.) The agreement further provides that the Diedrichs "promise to make payments of principal and interest on the same day of each succeeding month until 2/28/37, at which time a final balloon payment in an amount equal to all remaining amounts under the Note and Modification will be due." (ECF No. 44-4 at 3, ¶ 5.) Additionally, the agreement provides that,

> Upon Modification, the annual rate of interest charged on the unpaid principal balance of your loan will be 2.0000%. This rate will remain in effect

---

[2] The parties submitted the Loan Modification Agreement three times. The agreements appear identical except that only the Diedrichs submitted a cover letter that they identify as part of the Loan Modification Agreement (ECF Nos. 42-1 at 1; 43-1 at 1), and the version submitted by Ocwen contains a check mark and stamp in the portion for Ocwen's signature (ECF No. 44-4 at 3). The court will generally cite to that which appears at ECF No. 44-4 at 2-4 because it is the most legible version.

Case 2:17-cv-01104-WED   Filed 06/15/20   Page 2 of 34   Document 69

until 07/01/16 and beginning with your first payment after the Trial Period expiration. At the end of this period your rate will be 4.5% and will remain fixed until the maturity of your loan.

(ECF No. 44-4 at 3, ¶ 7.)

In early 2013 the Diedrichs mailed multiple letters to Ocwen requesting information about their account. *See Diedrich v. Ocwen Loan Servicing, LLC*, No. 13-CV-693, 2015 U.S. Dist. LEXIS 53996, at *5-6 (E.D. Wis. Apr. 24, 2015). Alleging that Ocwen's responses were insufficient, the Diedrichs' filed suit. *Id*. The district court granted Ocwen's motion for summary judgment on April 24, 2015, *id.*, and the Diedrichs appealed.

Shortly after oral argument was held before the court of appeals, *see Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016), Ocwen sent a letter to the Diedrichs on February 26, 2016, advising them that the interest rate under the Loan Modification Agreement would be increasing to 4.5 percent on June 1, 2016, and that the monthly mortgage payment would be increasing to $1,292.57 beginning with the payment due on July 1, 2016. (ECF No. 56, ¶ 11; ECF No. 44-5.) Ocwen sent a similar letter on May 2, 2016. (ECF No. 56, ¶ 12; ECF No. 41-1.)

The Diedrichs understood that their interest rate would increase on July 1, 2016, not June 1, 2016, as stated in Ocwen's letters. (ECF No. 53, ¶ 8; *see also* ECF No. 53, ¶ 27) The Deidrichs further believed that, although their interest rate would increase, they thought their monthly payment would never change. (ECF Nos. 53, ¶¶ 9, 33; 56, ¶¶ 26,

3

36.) It was their understanding that the additional interest would be rolled into the balloon payment due at the end of the loan term. (ECF Nos. 53, ¶ 40; 56, ¶¶ 27, 27.) They further thought that their monthly escrow payment would likewise never change even if their property taxes or insurance costs increased. (ECF No. 56, ¶ 28.) Again, they thought that, if these costs increased, the additional costs would be added to the balloon payment. (ECF No. 56, ¶ 28.) As a result, the Diedrich's sent a letter to Ocwen on June 1, 2016, asking questions about their loan and the recent notices from Ocwen. (ECF No. 56, ¶ 13.)

Ocwen acknowledged receipt of the Diedrichs' letter on June 10, 2016, and on July 21, 2016, it sent an additional letter stating that it needed more time to investigate their request for information. (ECF No. 53, ¶ 12.) Because of the Diedrichs' prior suit against Ocwen, which was still pending in the court of appeals, a "litigation flag" had been placed in the Diedrichs' file, requiring Ocwen's "research department" to contact Ocwen's "internal litigation department" about the Diedrichs' letter. (ECF No. 56, ¶ 22; *see also* ECF No. 53, ¶ 15.) Because of the active litigation, Ocwen's "research department" left it to the "litigation department" to respond to the Diedrichs' inquiry. (ECF No. 53, ¶¶ 18-19.) But the "research department" failed to send the Diedrichs' letter to the "litigation department." (ECF No. 53, ¶ 20.) Thus, neither the "research department" nor the "litigation department" ever offered a substantive response to the Diedrichs' letter. (ECF No. 53, ¶¶ 21-22, 25.)

### 1.2. The Plaintiffs' Claims and the Parties' Motions

The Diedrichs filed this lawsuit on August 9, 2017. (ECF No. 1.) Both sides have moved for summary judgment. (ECF Nos. 37, 45.) The briefing on the motions is complete, and all parties have consented to have this court resolve this matter. (ECF Nos. 31, 32.)

The Diedrichs' complaint[3] contains three causes of action. However, both the first and third causes of action contain more than one cause of action each. In addition, in some respects the causes of action overlap with each other. That has created confusion in the parties' summary judgment briefing, as discussed below. And it makes discussing summary judgment by each cause of action difficult. Therefore, the court discusses the parties' motions not by cause of action but by the conduct complained of.

The complaint asserts claims related to three distinct actions by Ocwen. First, the Diedrichs claim that Ocwen improperly increased their monthly payments. This allegedly violated Wis. Stat. § 224.77(1)(m) (ECF No. 1, ¶ 52), which makes it unlawful for any "mortgage banker," including a mortgage servicer, Wis. Stat. § 224.71(3), to "[e]ngage in conduct, whether of the same or a different character than specified elsewhere in this section, that constitutes improper, fraudulent, or dishonest dealing." Wis. Stat. § 224.77(1)(m). This same conduct also allegedly violated Wis. Stat.

---

[3] The numbering of the paragraphs in the Diedrichs' complaint is erratic. Numbers are skipped, repeated, and non-sequential. Citations reflect the numbering of the complaint.

§ 224.71(1)(k), which makes it unlawful for a mortgage loan servicer to "[v]iolate any provision of this subchapter, ch. 138, or any federal or state statute, rule, or regulation that relates to practice as a mortgage banker, mortgage loan originator, or mortgage broker." Both the Diedrichs (ECF No. 38 at 5-10) and Ocwen (ECF No. 46 at 19-21[4]) seek summary judgment on this claim.

Second, the Diedrichs claim that Ocwen increased the interest rate a month early, thus violating Wis. Stat. § 224.77(1)(m) (ECF No. 1, ¶ 52) and in turn violating Wis. Stat. § 224.77(1)(k). The Diedrichs seek summary judgment on this claim. (ECF No. 38 at 5-6.) For its part, although stating it is seeking summary judgment as to the entirety of the Diedrichs' first and third causes of action (ECF No. 46 at 17), Ocwen never addresses the Diedrichs' claims that it violated Wis. Stat. § 224.77(1)(m) and (k) by raising their interest rate a month early. Rather, Ocwen discusses Wis. Stat. § 224.77(1)(k) only in conjunction with the Diedrichs' claims that Ocwen violated these statutes by not responding to the Diedrichs' inquiry. (ECF No. 46 at 23.) The closest Ocwen comes to addressing the Diedrichs' claim regarding the early increase of the interest rate is in conjunction with its discussion of the Diedrichs' first cause of action, wherein the Diedrichs alleged violations of Wis. Stat. § 138.052(7) and (7s)(a). (*See* ECF No. 46 at 6.) Although the Diedrichs argue in response to Ocwen's motion for summary judgment that the premature increase in the interest rate violated Wis. Stat. § 138.052(7) (ECF No. 55 at 16), no such allegation was

---

[4] Citations reflect the ECF pagination.

included in their complaint. In their complaint, the only conduct that the Diedrichs alleged violated Wis. Stat. § 138.052(7) and (7s)(a) was "Ocwen's failure to provide a timely answer to the Diedrichs' borrower inquiry." (ECF No. 1, ¶ 34.)

Third, Ocwen failed to respond to the Diedrichs' June 1, 2016 letter, allegedly violating the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605(e)(1) and (2). (ECF No. 1, ¶¶ 36-48.) The lack of a response also allegedly violated Wis. Stat. § 138.052(7) and (7s)(a). (*See* ECF No. 1, ¶¶ 26-35.) In turn, these violations allegedly also violated Wis. Stat. § 224.71(1)(k). The Diedrichs (ECF No. 38 at 4-5, 10-13) and Ocwen (ECF No. 46 at 8-21, 23) seek summary judgment as to the RESPA claim.

In moving for summary judgment, Ocwen noted that Wis. Stat. § 138.052(7) and (7s)(a) had no relevance to a claim that Ocwen did not respond to the Diedrichs' inquiry. (ECF No. 46 at 17.) In response, the Diedrichs made no effort to argue that Ocwen's lack of a response violated Wis. Stat. § 138.052(7). Therefore, the court finds the Diedrichs have abandoned this claim. In addition, the Diedrichs explicitly abandoned their claim that Ocwen violated Wis. Stat. § 138.052(7s). (ECF No. 55 at 16 and fn. 1.)

A heading in the Diedrichs' complaint also referred to Wis. Stat. § 224.77(1)(L). (ECF No. 1 at 6.) However, that subsection is not otherwise referenced in the complaint. Nor did the Diedrichs refer to that subsection in response to Ocwen's motion for summary judgment. Therefore, the court finds that, to the extent it was ever properly

alleged in the first place, the Diedrichs have abandoned any claim under Wis. Stat. § 224.77(1)(L).

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## 3. Analysis

### 3.1. Claim Preclusion

Ocwen argues that the Diedrichs' claims that Ocwen violated the Loan Modification Agreement when it increased their monthly principal and interest payments are barred under the doctrine of claim preclusion. (ECF Nos. 46 at 19-21; 51 at 18-19; 59

at 11-12.) Specifically, it contends that the Diedrichs should have raised these claims in the lawsuit they brought against Ocwen back in 2013. Ocwen seems to be arguing that, when the Diedrichs filed that lawsuit, they should have anticipated that in 2016 Ocwen was going to raise their monthly payments and increase the interest rate a month earlier than they expected. As a result, they should have sought a declaration in that first lawsuit that Ocwen could not raise the monthly payments and increase the rate effective June 1, 2016.

But judgment in that action was entered on May 24, 2015. (*See Diedrich et al v. Ocwen Loan Servicing LLC*, 13-cv-00693-NJ, ECF No. 60.) The matter was appealed, with oral argument taking place on January 5, 2016, and the Court of Appeals for the Seventh Circuit not issuing its decision until October 6, 2016. *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016). There was no practical way for the Diedrichs to have added to that action the claims asserted in this lawsuit.

Absent additional evidence, such as Ocwen having communicated its future intention to increase the monthly principal and interest payment effective June 1, 2016, there likely would have been no jurisdiction over such a declaratory action for lack of a case or controversy. Passing that problem, Ocwen's argument fails on its merits. The doctrine of claim preclusion is a doctrine of public policy "to prevent endless litigation." *Wis. Pub. Serv. Corp. v. Arby Constr., Inc.*, 2012 WI 87, ¶33, 342 Wis. 2d 544, 818 N.W.2d 863. "The elements of claim preclusion are traditionally stated as '(1) an identity between

the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and, (3) a final judgment on the merits in a court of competent jurisdiction.'" *Id.* at ¶35 (quoting *N. States Power Co. v. Bugher*, 189 Wis. 2d 541, 551, 525 N.W.2d 723, 728 (1995); citing *Kruckenberg v. Harvey*, 2005 WI 43, ¶21, 279 Wis. 2d 520, 694 N.W.2d 879; *Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212, 233-34, 601 N.W.2d 627 (1999)). Although the doctrine can apply to any claim that *could have been* asserted in a prior suit between the same parties, *Wis. Pub. Serv. Corp.*, 2012 WI 87, ¶34, it does not require prescience of unforeseen claims, *cf. Kruckenberg*, 2005 WI 43, ¶25 (holding that, despite prior litigation between adjoining property owners where boundary line could have been litigated, claim preclusion did not bar subsequent claim).

Although both of the Diedrichs' actions involve the same Loan Modification Agreement, the actions were not part of the same "transaction" in that they are separated by time, origin, and motivation. *See Kruckenberg*, 2005 WI 43, ¶¶25-27 (discussing Restat 2d of Judgments, § 24(2) (1982)). The prior action does not bar the Diedrichs' present claims any more than this action would bar a later action should Ocwen (or the Diedrichs) violate the Loan Modification Agreement in some new and unforeseen way. Having once litigated one aspect of a contract does not mean that claim preclusion gives a party license to violate that contract in some other way. None of the Diedrichs' claims are barred under the doctrine of claim preclusion.

### 3.2. Increased Monthly Principal and Interest Payment

Underlying this action is the poorly drafted Loan Modification Agreement. (ECF

No. 44-4 at 2-3.) In relevant part the agreement provides:

> 1. In order for the terms of this modification to become effective, you promise to make an initial payment of $952.71 on or before 5/30/11 and one (1) equal monthly payment of principal and interest in the amount of $640.98 to Ocwen ("Trial Period") beginning on 7/1/11.

> 2. You agree that, at the end of the Trial Period, the new principal balance due under your modified Note and the Mortgage will be $207,456.98. Upon modification, your Note will become current and will not be in default.

> 3. Any payments due for taxes or insurance will be your responsibility in addition to the payments of principal and interest required under the terms of this modification. If this loan is currently escrowed, Ocwen will continue to collect the required escrow amounts with your monthly principal and interest payment

> * * *

> 5. You promise to make payments of principal and interest on the same day of each succeeding month until 02/28/37, at which time a final balloon payment in an amount equal to all remaining amounts under the Note and Modification will be due.

> 6. Upon Modification, the new amount payable under your Note and the Mortgage will be increased to the total amount of debt owed on your loan.

> 7. Upon Modification, the annual rate of interest charged on the unpaid principal balance of your loan will be 2.0000%. This rate will remain in effect until 07/01/16 and beginning with your first payment after the Trial Period expiration. At the end of this period your rate will be 4.5% and will remain fixed until the maturity of your loan.

> * * *

9. You will comply with all other covenants, agreements, and requirements of your Mortgage, including without limitation, the covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that you are obligated to make under the Mortgage, except as otherwise provided herein.

(ECF No. 44-4 at 2-3.)

The parties agree that after the trial period the Diedrichs' monthly principal and interest payment would be $640.98. This figure is identified in the cover letter to the Loan Modification Agreement as the "NEW MONTHLY PAYMENT." (ECF Nos. 42-1 at 1; 43-1 at 1.) That amount does not appear in the portion of the Loan Modification Agreement that Ocwen submitted to the court except as the amount of the second payment in the "Trial Period." (ECF No. 44-4 at 2, ¶ 1.)

The Diedrichs argue that this was to be their principal and interest payment for the life of the loan—that is, until February 28, 2037. Ocwen contends that this amount was their payment only until July 1, 2016, when the interest rate increased to 4.5 percent, at which time the principal and interest payment would adjust to some higher amount (albeit an amount not set forth in the Loan Modification Agreement or the cover letter). (ECF No. 51 at 20-23; *see also* ECF No. 46 at 21.)

The Diedrichs do not point to any provision in the agreement that says that their monthly principal and interest payment would remain fixed at $640.98 even after the increase in the interest rate. But, conversely, neither does Ocwen point to any provision of the agreement that says the monthly payment would increase when the interest rate

increased. (ECF No. 46 at 21.) Nor is there any indication in the agreement as to how the $640.98 figure was arrived at (or, for that matter, how Ocwen concluded that as of June 1, 2016, the new principal and interest payment would be $906.91 (ECF No. 41-1 at 2)).

Ordinarily, the monthly payment on an installment loan is determined through a straightforward amortization calculation, with the amount of the loan, the interest rate, and the term of the loan as the variables. But that is not possible here because the parties agree that, even if the Diedrichs made every payment called for under the Loan Modification Agreement, the loan would not be paid off at the end of the term. That is why the agreement called for a balloon payment. (ECF No. 44-4 at 3, ¶ 5.) According to the Diedrichs, the increase in the interest rate simply meant that the balloon payment would be more than it would have been had the rate not increased, but it did not give Ocwen the right to increase the monthly payments. (ECF No. 38, fn. 6.)

Under a traditional installment loan—one where making all of the installment payments results in the loan being paid off at the end of the term—any reasonable borrower should expect that, when his interest rate changes, his installment payments will also change. But that is not necessarily true when a loan term ends with a balloon payment. Any ambiguity as to the effect of the increased interest rate on the monthly payment could have been easily avoided by simply providing that, once the interest rate increases, the monthly payments will be increased by a specific amount, or by attaching

a payment schedule, or even by merely stating the amount of the expected balloon payment. But the Loan Modification Agreement said or did none of these things.

Indeed, the agreement contains nothing to suggest that it was unreasonable for the Diedrichs to believe their monthly payment would remain the same despite an increase in the interest rate. In fact, the portion of the agreement explaining the balloon payment may be read as supporting the Diedrichs' understanding of the loan:

> The loan modification for which you have applied contains a balloon provision. This means that even if you make all payments full and on time, the loan will not be paid in full by the final payment date. A single balloon payment will be due and payable in full on 2/28/37, provided that all payments are made in accordance with the loan terms and the interest rate does not change for the entire loan term. The balloon payment may vary depending on your payment history, and, if you have an adjustable rate mortgage, any interest rate changes that occur during the life of the loan.

(ECF No. 44-4 at 4.) It is the last sentence that is material. The Diedrichs had an adjustable rate mortgage. If the Loan Modification Agreement provided for any increase in the interest rate to be accounted for in an increased monthly payment, as Ocwen argues, then the balloon payment would *not* vary based on an increase in the interest rate. By saying that the balloon payment *may* vary depending on a change in the interest rate, the implication is that the increase in the interest rate will not be accounted for in a higher monthly payment. But it is also possible that an interest rate increase could result in an increase in *both* the monthly payment and the balloon payment if the increase in the monthly payment did not fully account for the interest rate increase. However, nothing in the Loan Modification Agreement suggests that the Diedrichs' monthly payments

would increase pursuant to any sort of formulaic or proportional basis, and there is no indication that this was how Ocwen calculated the Diedrichs' new monthly payment.

All Ocwen can offer to support its view that the Loan Modification Agreement authorizes an increase in the Diedrichs' monthly payments is that, "when the interest rate increased to 4.5%, it goes without saying (and is simple common sense) that the monthly payment would increase based on the interest rate increase." (ECF No. 46 at 21.) As noted above, ordinarily that would be true. But given the balloon payment, and particularly the admonition that a change in the interest rate may result in a change in the balloon payment, it was not necessarily inconsistent with the text of the agreement for the Diedrichs to believe that their monthly payments would remain the same.

Reading the Loan Modification Agreement this way does not lead to an absurd result, as Ocwen argues (ECF No. 51 at 21-22). The outcome—whereby the lender receives accrued interest only at the end of the loan term through the balloon payment—is no more "absurd" than that associated with any loan whereby payments over the term will not result in a full payment of the balance. Loans that include balloon payments are not unusual. Ocwen still stands to receive all the interest called for in the Loan Modification Agreement; it's just that it will receive it in conjunction with the balloon payment. Ocwen drafted the Loan Modification Agreement. If it intended a different outcome, it was incumbent upon it to have been clearer when it drafted the agreement. *See Ash Park, LLC*

*v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶36, 363 Wis. 2d 699, 866 N.W.2d 679 (noting that ambiguous contracts will be construed against the drafter).

Having rejected Ocwen's only arguments in support of its motion for summary judgment, Ocwen's motion for summary judgment must be denied as to the Diedrichs' claim that Ocwen improperly increased their monthly payments (*see* ECF No. 1, ¶ 52). However, the court does not find that summary judgment in favor of the Diedrichs is appropriate. The court cannot say as a matter of law that the Loan Modification Agreement prohibited any increase in the monthly payments. That is only one reasonable reading of the agreement. A reasonable finder of fact could also find, as Ocwen argues, that an increase in an interest rate will naturally result in some increase in the monthly payment. Therefore, the Diedrichs' motion for summary judgment is also denied as to this claim.

### 3.3. Real Estate Settlement Procedures Act

"RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans …. *See* 12 U.S.C. § 2601 (Congressional findings). The statute imposes a number of duties on lenders and loan servicers." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). One such duty is an obligation to respond to certain requests for information from borrowers. 12 U.S.C. § 2605(e).

### 3.3.1. Qualified Written Request

A loan servicer is required to respond to a borrower's inquiry only if that borrower makes a "qualified written request" (QWR). *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). A QWR is

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
>
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

> Within 60 days after receiving a qualified written request, the servicer must take one of three actions: either (1) make appropriate corrections to the borrower's account and notify the borrower in writing of the corrections; (2) investigate the borrower's account and provide the borrower with a written clarification as to why the servicer believes the borrower's account to be correct; or (3) investigate the borrower's account and either provide the requested information or provide an explanation as to why the requested information is unavailable.

*Catalan*, 629 F.3d at 680 (citing 12 U.S.C. §§ 2605(e)(2)(A), (B), and (C)).

"RESPA does not require any magic language before a servicer must construe a written communication from a borrower as a qualified written request and respond accordingly." *Catalan*, 629 F.3d at 687. "Any reasonably stated written request for account information can be a qualified written request." *Id*. However, for an inquiry to be a qualified written request it must relate to the "servicing" of the loan. *Perron v. J.P. Morgan*

*Chase Bank, N.A.*, 845 F.3d 852, 857 (7th Cir. 2017); *Mikulski v. Wells Fargo Bank, N.A.*, No. 17-CV-179, 2017 U.S. Dist. LEXIS 136834, at *6 (E.D. Wis. Aug. 25, 2017). "'Servicing' means 'receiving any periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts ... , and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required' by the terms of the loan." *Perron*, 845 F.3d at 857 (quoting 12 U.S.C. § 2605(i)(3)). "So a qualified written request can't be used to collect information about, or allege an error in, the underlying mortgage loan." *Id.*

On June 1, 2016, the Diedrichs sent a letter to Ocwen. (ECF No. 42-2.) It begins, "This letter is to help us get answers to recent problems on our mortgage account." (ECF No. 42-2 at 1.) The letter explains the history and details of their loan modification and states that "[i]t was our understanding that our principal and interest payment would remain $640.98 for the life of the loan, such that after the interest rate reset to 4.5% on July 1, 2016, additional arrearages would accrue that would be added to the final balloon payment." (ECF No. 42-2 at 1.) The letter notes that the Diedrichs received a letter from Ocwen stating that their interest rate would reset on June 1, 2016, and that their total monthly payment would increase to $1,221.01. (ECF No. 42-2 at 1.) The letter states, "Both of those adjustments seemed incorrect: the interest rate would not increase until July 1, 2016, and any new payments would begin on August l, 2016." (ECF No. 42-2 at 1.) The letter then proceeds to offer detailed calculations based on the Diedrichs' understanding

of the Loan Modification Agreement. (ECF No. 42-2 at 1-2.) The letter notes that "[t]he modification agreement does not say that the payment would ever increase," and argues that, if payments were to increase, the increased payments should result in the same percentage underpayment as the payments under the prior interest rate. (ECF No. 42-2 at 2.) The Diedrichs' letter also noted that their escrow statement included a "Misc Escrow Disbursement" which resulted in a deficit in the escrow account, although it was unclear to them what the disbursement was for.

The June 1, 2016 letter continued, "We are requesting that Ocwen provide us with" information set forth in eleven numbered paragraphs, including:

1. A complete accounting of the loan from inception to date, showing all payments received, all moneys disbursed, application of payments, and interest rates in effect at the time of each payment.

2. A complete accounting (to the extent it is not included in the response to request 1) of the escrow account.

3. A description of what the payment of the April 2015 "MISC" escrow disbursement was including but not limited to: the person/entity it was paid to, the reason it was disbursed, and proof that the payment was made such as receipts or credits.

…

6. A description of how the new payment required by the February 2016 letter in the amount of $906.91 for principal and interest was determined, including any formulas applied to determine that amount, and an identification of any and all employees who helped determine that amount would be acceptable or demanded in the letter.

7. A total amount owed as of a date certain that is June 1, 2016, or thereafter, broken down into principal, interest, late fees, other charges or disbursements, and other amounts owed, identifying the total of each amount by category (with descriptions sufficient for us to determine

what the category is) and a statement of whether each category is
accruing interest.
…

(ECF No. 42-2 at 2-3.)

It is undisputed that Ocwen never substantively responded to the Diedrich's June
1, 2016 letter. Nonetheless, Ocwen argues that "Plaintiff's RESPA claims fail because their
purported qualified written request ('QWR') does not relate to the 'servicing' of a loan as
that term is defined by the statute. Instead, the purported QWR included grievances
about the terms of the LMA that they agreed to five years earlier, and whether the terms
would change in the future." (ECF No. 46 at 8.)

Ocwen is correct that some of the Diedrichs' inquiries relate to the underlying
Loan Modification Agreement and are outside the statutory scope of "servicing." For
example, the Diedrichs' inquiry regarding how the $640.98 initial payment—as set forth
in the Loan Modification Agreement—was calculated (ECF No. 42-2 at 3, ¶ 5), relates
simply to the terms of the agreement rather than the servicing of the loan. However, that
cannot be said for the all of the Diedrichs' questions. For example, the inquiry as to the
nature and basis for the escrow disbursement was clearly related to the servicing of the
loan. As such, Ocwen violated RESPA when it failed to respond to the Diedrichs' inquiry.

### 3.3.2. Damages

Despite Ocwen's undisputed failure to substantively respond to the Diedrichs'
June 1, 2016 letter, the Diedrichs' RESPA claim may proceed only if they have adequately

shown that they suffered damages from Ocwen's failure to respond. Ocwen argues that the Diedrichs have not shown that they suffered any damages. Two types of damages are available for violations of RESPA—actual damages, 12 U.S.C. § 2605(f)(1)(A), and, "in the case of a pattern or practice of noncompliance with the requirements of" RESPA, statutory damages of up to $2,000, 12 U.S.C. § 2605(f)(1)(B).

### 3.3.2.1. Statutory Damages

Ocwen argues that the Diedrichs cannot prove that its failure to respond to the Diedrichs' inquiry was the result of a pattern or practice of noncompliance with the requirements of RESPA. Therefore, statutory damages are unavailable. (ECF Nos. 46 at 11-12; 51 at 15-16; 59 at 6-10.) The Diedrichs respond by arguing that it is Ocwen's practice to not respond to qualified written requests. (ECF No. 55 at 5-12.)

Some courts have said a "pattern or practice" amounts to a "standard or routine way of operating." *Golbeck v. Johnson Blumberg & Assocs., LLC*, No. 16-cv-6788, 2017 U.S. Dist. LEXIS 112493, at *36 (N.D. Ill. July 19, 2017) (quoting *In re Maxwell*, 281 B.R. 101, 123 (Bankr. D. Mass. 2002); citing *Renfroe v. Nationstar Mortg.*, LLC, 822 F.3d 1241, 1247 (11th Cir. 2016)). Other courts have said that a plaintiff must be able to point to violations involving other borrowers in order to prove that noncompliance was a product of a "pattern or practice." *Id.* (citing *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 523 (10th Cir. 2013)).

The Diedrichs' argument focuses on Ocwen's policies and how those policies are allegedly insufficient to track and follow-up with inquiries. They note that this is the second time that they have sued Ocwen for failing to adequately respond to a qualified written request. By pointing to deposition evidence from the two cases regarding Ocwen's procedures, they argue that "Ocwen's procedures have not improved" since the first lawsuit. (ECF No. 55 at 8.) In their view, Ocwen should "have some sort of flag or checkpoint that would determine a QWR was responded to within the time limits required by federal law …." (ECF No. 55 at 10-11.) Finally, they note that the Consumer Financial Protection Bureau (CFPB) filed suit against Ocwen, alleging that a significant percentage of its loan records contained errors. (ECF No. 55 at 11-12.)

The Diedrichs do not argue that the CFPB's action related to Ocwen's failure to respond to qualified written requests under RESPA or that it is otherwise relevant to their claim for statutory damages. As for the fact that the Diedrichs twice failed to receive adequate responses from Ocwen, two instances do not establish a pattern or practice. *Renfroe*, 822 F.3d at 1247 (citing *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 445 (E.D.N.Y. 2013)); *see also Perron*, 845 F.3d at 858. The evidence shows that Ocwen's failure to respond to the Diedrichs' 2016 letter was a result of the unusual status of the Diedrichs' relationship with Ocwen—specifically, their pending lawsuit, and two departments each assuming the other was responding to the Diedrichs. This was sloppy

but not suggestive of a pattern or practice in the absence of other similarly situated borrowers also not receiving responses to qualified written requests.

Moreover, alleged insufficiencies in Ocwen's policies for responding to qualified written requests, which the Diedrichs contend "are likely to lead to failure to respond to QWRs" (ECF No. 55 at 12), is not evidence of an actual "practice of noncompliance." The depositions cited by the Diedrichs demonstrate that Ocwen had procedures and personnel in place for responding to borrowers' inquiries. Perhaps Ocwen could, as the Diedrichs suggest, track and flag inquiries to ensure compliance with federal law. But the mere absence of such a system does not support a finding that Ocwen had a practice of noncompliance.

The Diedrichs have shown that there are gaps in Ocwen's policies through which some inquiries (such as theirs) may fall. But they have not shown that anyone else was impacted, and thus have not presented evidence from which a reasonable finder of fact could find "a pattern … of noncompliance." Therefore, the Diedrichs are not entitled to statutory damages for Ocwen's failure to respond to their qualified written request.

### 3.3.2.2. Actual Damages

The Diedrichs argue that Ocwen's failure to respond to their letter has caused them emotional distress in the amount of $50,000 each. (ECF No. 44-13 at 3). Specifically, they contend that,

> without an explanation as to how Ocwen determined the new payment and
> why they raised the payment, they cannot determine if they are making the

Case 2:17-cv-01104-WED   Filed 06/15/20   Page 23 of 34   Document 69

correct payment and have to worry about future resets of payments. They also have to worry that their money is not being applied correctly to the loan, and cannot be sure where the extra $265 or so each month is being applied. This has made them worry that Ocwen might not be applying the money to the principal and interest, and that because of that they might be declared in default again and forced to defend a foreclosure.

(ECF No. 38 at 11.) They also argue that the absence of a response from Ocwen caused them to "be [un]certain they are interpreting the agreement correctly," and a response might have allowed "them to better understand the loan modification." (ECF No. 38 at 12.) The absence of the requested accounting allegedly resulted in them being "distressed over possible misapplication of their payments, future miscalculations of their payments, use of their P&I payments to pay escrow disbursements that should not have been made, or any of the other things they worry about …." (ECF No. 38 at 13-14.) Finally, they allege that they have been damaged in the amount of $265 per month because of the additional payments they are making to avoid default.

The only relevant authority the Diedrichs offer in support of their contention that they have presented adequate proof of actual damages is *Johnson v. HSBC Bank USA*, No. 3:11-cv-2091-JM-WVG, 2012 U.S. Dist. LEXIS 36798 (S.D. Cal. Mar. 19, 2012) (ECF No. 38 at 11), and *Goodin v. Bank of Am., N.A.*, 114 F. Supp. 3d 1197 (M.D. Fla. 2015) (ECF No. 55 at 13). But *Johnson* noted merely that a complaint was sufficient to survive a motion to dismiss (not a motion for summary judgment, as here) when the plaintiff alleged that the defendant's failure to provide him the requested information resulted in him paying

more than was necessary on his loan. The decision says nothing about emotional distress. *Johnson*, 2012 U.S. Dist. LEXIS 36798, at *17.

Thus, *Johnson* is relevant only to the Diedrichs' claim that the $265 more they pay each month are damages resulting from Ocwen's failure to respond to their letter. But the Diedrichs have not adduced any evidence that Ocwen's failure to respond to their June 1 letter caused the additional payment. Therefore, no reasonable finder of fact could conclude that Ocwen's failure to respond to the Diedrichs' letter damaged them in the amount of $265 per month.

*Goodin*, meanwhile, deals with emotional distress but not with RESPA. It is further distinguishable on a number of fronts. *Goodin* is a decision following a court trial. The court awarded damages for emotional distress under the Fair Debt Collection Practices Act because the plaintiffs "suffered prolonged (over two and a half years) stress, anxiety, and sleeplessness as a result of Bank of America's misrepresentations regarding the amount of the debt the Goodins owed" as a result of the bank's "gross negligence" and "indifference." *Goodin*, 114 F. Supp. 3d at 1213. The facts in *Goodin* were extraordinary and complex but boil down to the bank having made a mistake, which resulted in the homeowners being threatened with the loss of their home. Despite the plaintiffs' repeated attempts to point out the simple error to the bank, they were ignored, and the bank continued to proceed with threats, eventually filing a foreclosure action. These facts are wholly distinguishable from the facts here.

25

As the Diedrichs describe their experience, after narrowly avoiding losing their home Ocwen inexplicably demanded a much higher monthly payment. That was undoubtedly stressful, particularly to the extent that it led to renewed fears of losing their home. *See Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1061 (7th Cir. 2018) ("[T]he prospective and even imminent loss of a home can be highly stressful.").

Distress about a loan servicer's actions routinely will be the impetus for a borrower's qualified written request. But, as the Diedrichs learned from their last attempt to sue Ocwen, that distress is not compensable under RESPA. *Diedrich*, 839 F.3d at 593. To recover under RESPA the Diedrichs must show that *the lack of a response* to their June 1 letter, and not the conduct that led to them writing the letter, caused the emotional distress. *See id.*

Much of the Diedrichs' claimed stress is amorphous, contrived, and conclusory. For example, they allege that, because Ocwen raised their payment once, absent an explanation from Ocwen they are afraid that Ocwen may someday again raise the monthly payment. But no finder of fact could conclude that such a fear is reasonable. The increased payment was obviously tied to the 2016 interest rate adjustment. Because the agreement does not provide for any further adjustments to the interest rate, no reasonable person could fear further adjustments in the monthly principal and interest payment.

Having said that, the court cannot conclude as a matter of law that the Diedrichs' did not suffer any emotional distress as a result of Ocwen's failure to respond to their

request. As noted above, some underlying stress over a servicer's action commonly will be the impetus for a borrower's qualified written request. The Diedrichs argue, in effect, that, by not responding, Ocwen prolonged their stress. A reasonable finder of fact, they argue, could conclude that this prolonged stress is compensable as emotional distress.

Ocwen has not demonstrated that this theory fails as a matter of law. The Diedrichs allege that Ocwen's unexplained $619.43 "Misc Escrow Disbursement" (ECF No. 42-2 at 2) caused them to worry whether Ocwen would properly use their escrow funds. (ECF Nos. 42 at 5, ¶ 20; 43 at 5, ¶ 20.) A reasonable finder of fact could conclude that the absence of an explanation for this disbursement caused stress to the Diedrichs, and Ocwen's lack of a response prolonged, if not exacerbated, that stress.

Granted, the worry that the Diedrichs describe in their briefs is comparatively benign. But the Court of Appeals for the Seventh Circuit has suggested that even minor emotional distress may be compensable for violations of RESPA, *see Catalan*, 629 F.3d at 696, provided there is an adequate causal connection between the defendant's failure to respond and the emotional distress, *see Moore*, 908 F.3d at 1061. The Diedrichs do not describe seeking medical attention for their emotional distress or experiencing physical symptoms of any kind. But they don't need to. *See EEOC v. Flambeau, Inc.*, 846 F.3d 941, 946 (7th Cir. 2017).

Their distress over the lack of a response to their escrow inquiry must be disentangled from un-compensable stress, such as that associated with the underlying

Loan Modification Agreement. But these facts go to the amount of the Diedrichs'

damages. The issue on summary judgment is whether the Diedrichs have produced

evidence from which a reasonable finder of fact could conclude that they suffered any

actual damages. Because Ocwen has not shown that, as a matter of law, the Diedrichs did

not suffer any actual damages as a result of Ocwen's failure to respond to their qualified

written request, the court must deny Ocwen's motion for summary judgment regarding

the Diedrichs' RESPA claim. *See Perdum v. Wells Fargo Home Mortg.*, No. 1:17-CV-00972-

SCJ-JCF, 2019 U.S. Dist. LEXIS 175691, at *16-17 (N.D. Ga. June 10, 2019).

### 3.4. Increased Interest Rate

The loan modification agreement provides:

> Upon Modification, the annual rate of interest charged on the unpaid
> principal balance of your loan will be 2.0000%. This rate will remain in effect
> until 07/01/16 and beginning with your first payment after the Trial Period
> expiration. At the end of this period your rate will be 4.5% and will remain
> fixed until the maturity of your loan.

(ECF No. 44-4 at 4, ¶ 7.)

On February 26, 2016, Ocwen sent the Diedrichs a letter that stated, "Pursuant to

the terms of your Loan Modification Agreement, your interest rate is scheduled to adjust

to 4.50000% effective 6/1/2016. The new payment amount will be $1,221.01 effective with

the 7/1/2016 payment." (ECF No. 44-5 at 2.) Ocwen sent another letter on May 2, 2016,

which stated: "The interest rate per the Loan Modification Agreement will adjust to

4.50000% on 6/1/2016. The monthly mortgage payment will also adjust to $1,292.57 beginning with the payment due on 7/1/2016." (ECF No. 41-1 at 1.)

In moving for summary judgment, Ocwen argues that the increase in the interest rate did not violate Wis. Stat. § 138.052(7) because that statutory provision applies only to "[i]nterest imposed on the amount due after acceleration or maturity of a loan," Wis. Stat. § 138.052(7). (ECF No. 46 at 22; 59 at 12-13.) Moreover, it argues that the Diedrichs "have provided no evidence that the monthly payment increased a month early." (ECF No. 59 at 13.)

The Diedrichs' response is terse: "[I]t is undisputed that the Diedrichs were told by Ocwen that their rate would be raised as of June 1, 2016 – and the contract only allowed the rate to increase as of July 1, 2016. Accordingly, a jury could find that Ocwen raised the interest rates on June 1, 2016." (ECF No. 55 at 16.)

One fact that neither side raises in this back-and-forth is that the Diedrichs never alleged in their complaint that Ocwen violated Wis. Stat. § 138.052(7) by increasing the interest rate a month early. The allegedly premature interest rate increase is discussed in conjunction with the Diedrichs' Wis. Stat. § 138.052(7) claim only with respect to the damages the Diedrichs allegedly suffered as a result of Ocwen's lack of a response to their inquiry. (ECF No. 1 at 35.)

Accepting that the Diedrichs have constructively amended their complaint to include this claim, summary judgment in favor of Ocwen is appropriate. By its plain

language, Wis. Stat. § 138.052(7) applies only to interest rates imposed "after acceleration or maturity of a loan." The alleged interest rate change here did not occur during a period of acceleration or following the maturity of the loan. Thus, Wis. Stat. § 138.052(7) is inapplicable to the Diedrichs' claim.

The Diedrichs did, however, allege in their complaint that Ocwen violated Wis. Stat. § 224.77(1)(m) by "dishonestly, fraudulently, and improperly increasing the interest rate a month early …." (ECF No. 1, ¶ 52.) Ocwen did not seek summary judgment as to this claim. Ocwen addresses the alleged violations of Wis. Stat. § 224.77(1) only in conjunction with the RESPA claims to argue that, because the RESPA claim failed, the alleged violations of Wis. Stat. § 224.77(1) also failed. (ECF No. 46 at 23; *see also* ECF No. 51 at 17-18; 59 at 13.) But the contention that Ocwen violated Wis. Stat. § 224.77(1)(m) by increasing their interest rate a month earlier than was authorized under the Loan Modification Agreement is independent of the Diedrichs' RESPA claims.

The Diedrichs *did* seek summary judgment on this claim. (ECF No. 38 at 5-6.) They argue:

> There can be no doubt that the first error the Diedrichs assign to Ocwen violates [sic] §224.77(1)(m) regardless of how the contract is interpreted. The loan modification agreement the parties signed to resolve the foreclosure case does not allow the interest to be increased before July 1, 2016, but Ocwen raised the interest (or threatened to do so, at least) a month early.

(ECF No. 38 at 6.) Ocwen does not address this claim in response to the Diedrichs' motion.

Again, Ocwen addressed the claimed violations of Wis. Stat. § 224.77 as dependent on the

Diedrichs' RESPA claim. (ECF No. 51 at 17-18 ("The Section 224.77 Claims (Count III) Fail Because Plaintiffs' RESPA Claims Fail as a Matter of Law.")

In the absence of any response from Ocwen, ordinarily the court would grant the Diedrichs' motion to summary judgment as to this claim. However, the court finds that, notwithstanding Ocwen's lack of a response, the Diedrichs have failed to show that they are entitled to summary judgment on this claim. Specifically, they have not presented any evidence that Ocwen actually did increase their interest rate a month early. They have established merely that Ocwen said it was going to do so. While in moving for summary judgment the Diedrichs seem to argue that merely threatening to raise their interest rate a month early would violate Wis. Stat. § 224.77(m) (ECF No. 38 at 6), no such claim was included in their complaint. The complaint alleges only that Ocwen *did* increase the interest rate a month early. (ECF No. 1, ¶ 52.)

In the absence of evidence that Ocwen actually did increase the Diedrichs' monthly payments a month earlier than authorized under the Loan Modification Agreement, the Diedrichs are not entitled to summary judgment on this claim.

**4. Conclusion**

The Diedrichs' belief that their monthly principal and interest payment would remain fixed despite an increase in their interest rate is consistent with the text of the Loan Modification Agreement. Therefore, the court must deny Ocwen's motion for summary judgment on the Diedrichs' claim that Ocwen violated Wis. Stat § 224.77(1)(m)

Case 2:17-cv-01104-WED   Filed 06/15/20   Page 31 of 34   Document 69

when it increased their monthly payment. (ECF No. 1, ¶ 52.) However, the Diedrich's reading of the Loan Modification Agreement is not the only reasonable reading, and therefore the court must also deny the Diedrichs' motion for summary judgment as to this claim.

As for the Diedrichs' RESPA claim (and related claim under Wis. Stat. § 224.77(1)(k) (ECF No. 1, ¶ 51)), the Diedrichs' letter was a qualified written request and there is no dispute that Ocwen failed to respond to it. In this regard, the Diedrichs' motion for summary judgment is granted and Ocwen's motion is denied. However, the Diedrichs have failed to present evidence that could support a finding that they are entitled to statutory damages. Therefore, as to the question of statutory damages, Ocwen's motion for summary judgment is granted. However, a factual dispute exists as to whether Ocwen's violation of RESPA resulted in actual damages to the Diedrichs. Accordingly, as to the question of actual damages, Ocwen's motion for summary judgment is denied.

The court grants summary judgment in favor of Ocwen as to the Diedrichs' "First Cause of Action." The Diedrichs' explicitly abandoned any claim under Wis. Stat. § 138.052(7s)(a). The court also finds that, by not addressing it in response to Ocwen's motion for summary judgment, the Diedrichs abandoned their claim that Ocwen violated Wis. Stat. § 138.052(7) by failing to "provide a timely answer to the Diedrichs' borrower inquiry" (ECF No. 1, ¶ 34). Alternatively, the claim clearly fails on its merits. The statute has no relevance to such a claim. Even construing the Diedrichs' claim, as Ocwen did, as

alleging that Ocwen violated Wis. Stat. § 138.052(7) by allegedly increasing their interest rate a month early, summary judgment in favor of Ocwen remains appropriate. The statute is irrelevant to an interest rate increase under the circumstances of this case.

As to the Diedrichs' claim that Ocwen violated Wis. Stat. § 224.77(1)(m) by increasing their interest rate a month early (ECF No. 1, ¶ 52), the Diedrichs have not proven that Ocwen actually did increase the interest rate early. Therefore, the Diedrichs are not entitled to summary judgment as to this claim.

Finally, to the extent it was ever properly alleged, the court finds that the Diedrichs abandoned any claim that Ocwen violated Wis. Stat. § 224.77(1)(L).

In sum, the finder of fact at trial will need to determine whether the Loan Modification Agreement fixed the Diedrichs' principal and interest payments at $643.98 for the life of the loan; whether the Diedrichs suffered any actual damages for Ocwen's violation of RESPA (and associated violation of Wis. Stats. § 224.77(1)(k)); the amount of any damages; whether Ocwen increased the Diedrichs' monthly payments a month early; whether doing so violated Wis. Stat. § 224.77(1)(m); and, if so, the amount of damages the Diedrichs suffered as a result.

**IT IS THEREFORE ORDERED** that Daniel and Natalie Diedrich's motion for summary judgment (ECF No. 37) is granted in part and denied in part, as set forth in this decision and order.

**IT IS FURTHER ORDERED** that Ocwen Loan Servicing, LLC's motion for summary judgment (ECF No. 45) is granted in part and denied in part, as set forth in this decision and order.

**IT IS FURTHER ORDERED** that the Clerk shall schedule a telephonic conference to discuss further scheduling.

Dated at Milwaukee, Wisconsin this 15th day of June, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge